**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**
**6:17-cv-02599-DCC**

Andrew N. Glisson,

                              Plaintiff,

              v.

Tim Riley, et al.
                              Defendants.

<u>**PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT**</u>

Plaintiff Andrew N. Glisson, by and through his undersigned counsel, submits his objections to the Magistrate Judge's Report filed January 14, 2020, in which the Honorable Kevin F. McDonald recommended that Defendants' motion for summary be granted.  (ECF # 75).

Plaintiff incorporates by reference in their entirety his memoranda in opposition to Defendants' motions, including exhibits.  (ECF ## 63 and 63-1 to 63-28 and 65.)

Plaintiff respectfully submits that the Magistrate Judge erred in three ways.  First, the Magistrate Judge erroneously embraced Defendants' call to focus on unrelated medical care that was provided to Plaintiff instead of focusing on the constitutionally denied care, the denial of which has left Plaintiff, at the age of 52, forever crippled, disabled and unable to support himself.  Second, the Magistrate Judge, despite assertions to the contrary, erroneously viewed the evidence in the light most favorable to Defendants.  Third, the Magistrate Judge recognized and discussed the existence of genuine issues of material fact, but erroneously proceeded to weigh the evidence, find in favor of Defendants and recommend that the Court grant summary judgment instead of allowing the case to proceed to a jury.

1

I.

The Magistrate Judge erroneously concluded that because Plaintiff received some medical treatment, then the fact he did not receive the crucial supervised physical therapy and was never personally examined or his condition assessed at any time by an SCDC physician from July 2015 through his release in August 2016 does not matter and cannot constitute deliberate indifference.[1] This fundamentally flawed reasoning affected the Magistrate Judge's view of all other evidence and his overall recommendation.

The Magistrate Judge recited a laundry list of medical care received by Plaintiff, just as Defendants did.  (ECF # 75, pp. 3-8; ECF # 57-1, Def. Mem., pp. 4-8.)  The Magistrate Judge concluded that "[i]ndeed, the record evidence establishes that the defendants did not ignore the plaintiff's injuries; instead, the plaintiff treated with an orthopedic clinic at Kirkland, attended physical therapy with Ms. Ellis, and received treatment when he signed up for sick call."  (ECF # 75, p. 17.)

The Magistrate Judge concluded that "the record evidence indicates that the plaintiff has received continuous care, and 'disagreements between an inmate and a physician over the inmate's proper medical care do not state' a claim unless exceptional circumstances exist."  (ECF # 75, p. 17.)  The Magistrate Judge concluded Plaintiff's assertions go only to his "treatment preferences, to which he is not constitutionally entitled."  (ECF # 75, p. 18.)  The Magistrate Judge found that "the medical records do not include a notation that the plaintiff was not receiving physical therapy" and "presuming that Dr. [Jack] Valpey should have realized that the plaintiff was not receiving physical therapy based on the plaintiff's verbal complaint to a nurse at sick call, Dr. Valpey's actions, at best,

---

[1] Dr. Alfred Moore testified he recalled seeing Plaintiff once, but did nothing more than refer him back to the consulting physicians.  (ECF # 63, Pl. Resp., pp. 12-13.)  Plaintiff testified he was never seen by any SCDC physician during the entire year, but only the nurses.  (ECF # 63, p. 5.)

amount to negligence or medical malpractice – neither of which are actionable under § 1983."
(ECF # 75, p. 19.)

In short, the Magistrate Judge concluded that Plaintiff received some medical care and any
complaints about what he did not receive simply go to disagreements between Plaintiff and the
SCDC physicians about proper medical care or are nothing more than Plaintiff's treatment
preferences.

The Magistrate Judge is incorrect.  Plaintiff *never* disagreed with his physicians about
proper medical care or sought treatment his physicians did not believe was necessary.  Plaintiff, a
construction worker with a high school education, had no treatment preferences whatsoever – other
than to get the care that consulting orthopedic physicians told him that he needed and which they
explicitly ordered as necessary for him to recover.  Plaintiff's ignorance about the necessary
treatment is the fundamental reason he needed medical attention and the ordered supervised
physical therapy so badly – because he did not even know what he did not know and did not know
how to help himself.  (ECF # 63, Pl. Resp., pp. 4-5.)  Plaintiff, in fact, only sought to obtain the very
treatment that the consulting physicians David Koon and Adam Money had explicitly ordered be
given to him – the supervised physical therapy.  Plaintiff did not receive the necessary therapy
because the SCDC physicians, and particularly the primary one in his case, Dr. Valpey, never
personally examined or assessed his condition during that entire year and never ensured he was
receiving care as ordered and recovering as expected.

The Magistrate Judge erred by focusing on what care was provided and concluding that care
was somehow relevant in the analysis of this case and somehow made up for the lack of critically
necessary care.  The focus instead should be on the specific care that was constitutionally denied
and the lack of which had a life-changing impact on Plaintiff, as testified to by Plaintiff and his
expert, Dr. Daniel Herman, who is board-certified in physical medicine and rehabilitation.  (ECF #

3

63, Pl. Resp., pp. 4-5, 21-26.)

"A failure to provide the level of care that a treating physician himself believes is necessary may constitute deliberate indifference." Jackson v. Lightsey, 775 F.3d 170, 179 (reversing dismissal of deliberate indifference claim against defendant physician with whom the inmate "has no quarrel. . . . On the contrary what Jackson wanted was exactly the testing and treatment that [the defendant physician] prescribed. Jackson's objection is that [the defendant physician] failed to enter the orders necessary to provide Jackson with the promised care, which resulted in Jackson going months without the testing and treatment for his serious heart condition that [the defendant physician] thought appropriate.") (citing Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir.1990), overruled in part on other grounds by Farmer v. Brennan, 511 U.S. 825 (1994)).

In Miltier, the Fourth Circuit held that prison doctors who had recommended that a patient, who ultimately died in prison of a heart attack, be transferred to a cardiac unit but failed to follow up on this recommendation, presented a triable claim of deliberate indifference. When a doctor prescribes tests or treatments for an unquestionably serious condition, the doctor must have done so "because he subjectively believed they were necessary, and therefore must have known that failing to provide them would pose an excessive risk to [the patient's] health. That is all Farmer requires, *see* 511 U.S. at 842, 114 S. Ct. 1970 (subjective prong may be met by showing that risk is sufficiently obvious that official must have known of it), and under *Miltier,* it is enough to state a claim of deliberate indifference." Jackson, 775 F.3d at 179 (internal quotes omitted). See also Hudson v. McHugh, 148 F.3d 859, 863-64 (7th Cir. 1998) (subjective prong satisfied by allegation that prison officials knew of inmate's epilepsy, a serious medical condition, and need for treatment but nevertheless failed to provide treatment); Miller v. Schoenen, 75 F.3d 1305, 1310-11 (8th Cir. 1996) (subjective prong satisfied by evidence that prison officials knew of inmate's heart transplant, a serious medical condition, and knew of need

4

for treatment based on medical records but nevertheless failed to provide treatment).

These cases teach that the focus must be on the specific, constitutionally denied care at issue which injured or killed the plaintiff. These cases teach that it is not just negligence or malpractice to never examine a patient and assess his condition and recovery for an entire year. It is not just negligence and malpractice to never provide medical treatment that was explicitly ordered. It is deliberate indifference.

What would it matter if the inmate with heart failure in <u>Miltier</u> or the inmate with epilepsy in <u>Hudson</u> received palliative treatment, but not critically needed care to prevent or treat an objectively serious medical condition or life-threatening injury? It would not matter and the inmate would have – and in fact did have – a cognizable claim. What did it matter that Plaintiff received pain medication or x-rays for his injuries (which were never reviewed or discussed by SCDC physicians) or was seen a few times over a year by a consulting orthopedic physician? It did not matter and Plaintiff has a cognizable claim. The provision of irrelevant treatment or related, but inadequate, treatment does not inoculate Defendants from culpability for denying the crucial, constitutionally required care at issue. If anything, it creates only a factual dispute which must be resolved by a jury.

Plaintiff received only three visits during the entire year from a licensed physical therapist. It is admitted by Defendants that Plaintiff never received any supervised physical therapy by medical staff even though supervised therapy was explicitly ordered by consulting physicians Koon and Money. (ECF # 75, p. 18; ECF # 63, Pl. Resp., pp. 4-5, 11.) It is admitted by Defendants and undisputed that SCDC physicians and staff had records available to them which showed the mandate for supervised physical therapy. (ECF # 63, Pl. Resp., pp. 11-12.) It is admitted by Defendants that, from the injury date of July 27, 2015, until Plaintiff's release on August 2, 2016, Dr. Valpey – the primary SCDC physician handling Plaintiff's care – reviewed and signed

off on the electronic medical records of Plaintiff seventeen times.  Yet Dr. Valpey never examined Plaintiff or assessed his condition even once.[2]  (ECF # 63, Pl. Resp., pp. 4-5, 10-11.) Drs. Valpey and Moore were responsible for examining Plaintiff, assessing his condition and ensuring that the ordered therapy actually was being provided.  (ECF # 63, Pl. Resp., pp. 12-13 and Pl. Resp., pp. 8-10 citing testimony of Lefford Fate, SCDC's deputy health services director.) Health Care Authority Yolanda Mitchell was required to bring to physicians' attention any necessary care that was not being done for a given inmate.  (ECF # 63, Pl. Mem, pp. 14-17 describing testimony of HCAs Mitchell and Daniel Mullins.)

When these facts are viewed in the light most favorable to Plaintiff – and when the focus properly is on the constitutionally denied medical care which injured Plaintiff and not on other irrelevant care – it is  obvious that Plaintiff has presented a genuine issue of material fact for determination by a jury.  The Court should reject the Magistrate Judge's recommendation and allow this case to proceed to trial.


## II.

The Magistrate Judge, despite assertions to the contrary, erroneously and repeatedly viewed the evidence and inferences that may be drawn from it in the light most favorable to Defendants. The Magistrate Judge also repeatedly recognized and discussed the existence of genuine issues of material fact, but erroneously proceeded to weigh the evidence, find it in favor of Defendants and recommend the Court grant summary judgment instead of allowing the case to proceed to a jury.

Viewing the evidence in the light most favorable to Plaintiff leads to the following summary of the facts:

---

[2]  Dr. Valpey, now age 87, is too ill to be deposed or testify at trial.  (ECF # 63, Pl. Resp., p. 12; ECF # 55, Order of The Honorable Kevin F. McDonald.)

It is undisputed that, from July 2015 to August 2016, Plaintiff never received the crucial supervised physical therapy that was ordered by the consulting physicians as necessary for recovery. Plaintiff was ignorant about such matters and did not know how to do the crucial therapy on his own, whether, e.g., he was doing exercises properly or too hard or not hard enough. Plaintiff saw a licensed physical therapist only three times and was provided with brief verbal instructions and a cryptic chart of exercises to do on his own in his cell. It is undisputed that Plaintiff, who had been terribly injured on a prison work crew while working on a roof where he never wanted to be, was never seen or examined even once in the entire year by Dr. Valpey, the primary SCDC physician overseeing his care. SCDC's Dr. Moore purportedly saw Plaintiff once but did nothing more than refer him back to the consulting physician, although Plaintiff testified he never saw any SCDC physician during the entire year. Neither the SCDC physicians nor HCA Mitchell ever took a single action to examine Plaintiff or investigate his case or the lack of necessary, ordered treatment despite myriad complaints from Plaintiff, his mother and his lawyer.

Dr. Herman testified that the lack of necessary care and the SCDC physicians' failure to ever examine Plaintiff or assess his condition constituted deliberate indifference, made his outcome far worse and crippled Plaintiff for life. Dr. Herman testified that a prison doctor is required to fulfill his responsibility in the same manner as any other doctor in any other setting – actually *examine* the patient, actually *assess* the patient's condition and course of treatment, actually *determine* what needs to be done to heal him and actually *ensure* the care is provided. SCDC's doctors are not allowed to simply to check a box on an electronic form and call it a day, which is exactly what happened in Plaintiff's case.

At his deposition, Dr. Herman explained that supervised physical therapy was recommended by consulting Dr. Koon "and signed by Dr. Valpey, but it was never carried out." "I don't have any records of any of the [SCDC] physicians providing any evaluation or other –

independent of the consulting physician [–] providing any evaluation of the elbow, seeing how it's doing, checking up on [Plaintiff], consulting with the consulting physician [Dr. Koon] . . . about other possible treatment options," he testified.  (ECF # 63, Pl. Resp., p. 26.)

"[T]he recommendations that were given by Dr. Koon were not enacted even though they were ordered.  And so there was really no follow-up or monitoring of the plan or of the patient's progress.  And I think that was due to significant detriment," Dr. Herman testified.  "They [SCDC physicians] know what should have been done.  They can't claim ignorance because they put the orders in and then nothing happened.  [Plaintiff] kept on coming in for complaints and things like that.  Nothing happened.  No other evaluations, no, hey, maybe let's, you know, think about physical therapy for his ankle."  (ECF # 63, Pl. Resp., p. 26.)

Plaintiff's evidence and the inferences that may be drawn from it present a jury issue on whether Defendants were deliberately indifferent.  How can it be anything but deliberate indifference when the primary SCDC physician who is supposed to oversee a terribly injured inmate's treatment never sees him even once in an entire year, but does nothing but sign off on computer-based records days after some palliative medical event occurred?  This case presents multiple issues which should be resolved by a jury.

In erroneously viewing the evidence in the light most favorable to Defendants, and in weighing the evidence and erroneously recommending that the District Court grant summary judgment, the Magistrate Judge focused on the overall scope of medical care provided to Plaintiff and ignored or overlooked the crucial nature of the supervised physical therapy that was never provided.  The Magistrate Judge acknowledged Plaintiff's testimony that he frequently complained about the lack of care and that he never saw any SCDC doctor at all, but considered such evidence unconvincing and found inadequate or inadmissible the written pleas from Plaintiff's mother to the wardens and the letters from Plaintiff's lawyer.  (ECF # 75, p. 8 n.5 & pp. 8-9.)  The

Magistrate Judge excused the culpability of Dr. Valpey for never examining Plaintiff because there was no notation in the record mentioning the lack of supervised therapy, even though Dr. Valpey never laid eyes on Plaintiff a single time.  (ECF # 75, p. 19; ECF # 63, Pl. Resp., pp. 4-5, 10-11.)  The Magistrate Judge excused the culpability of HCA Mitchell and Wardens Tim Riley and Bernard McKie by reasoning that they simply never received Plaintiff's complaints or saw letters from his mother or lawyer, even though they, Deputy Director Lefford Fate and HCA Daniel Mullins admitted it was the job of the wardens and HCA to receive such complaints and forward them on for handling by medical staff.  (ECF # 75, pp. 22-23; ECF # 63, pp. 8-10, 14-19.)  In the Magistrate Judge's view, the testimony of Defendants and their plea of ignorance is definitive and controlling regardless of the fact it is in direct conflict with the testimony and evidence presented by Plaintiff.  To the contrary, Defendants' awareness of Plaintiff's repeated complaints and their failure to act present disputed issues of fact for a jury's resolution.

The Magistrate Judge erroneously disregarded the fact of the mother's letters sent to the wardens due to the lack of an affidavit stating they were actually mailed.  (ECF # 75, p.8 n.5 & p. 23; ECF # 63-5.)  Is it plausible that Plaintiff's mother would write such letters and never mail them?  It is not unless you view the evidence in the light most favorable to Defendants.[3]  What is

---

[3]  Plaintiff has moved for leave to file an affidavit from Plaintiff's mother, Geraldine Goldman, and has filed an affidavit from her regarding the mailing of the letters.  (ECF # 76 and 76-1.)  The letters were submitted with Plaintiff's response in opposition.  (ECF # 63-5.)  Although the discovery deadline has expired, Defendants would suffer no prejudice whatsoever.  Defendants argue in summary judgment that they never received the letters, but do not argue that the letters were never mailed.  (ECF ## 57-1, pp. 10-12.)

The Magistrate Judge stated that Plaintiff's affidavit (ECF # 63-1) was incomplete because exhibits were not attached and missing.  The affidavit exhibits on which Plaintiff relies are included in the record.  EXHIBIT A in the affidavit, copies of Requests to Staff and Orders to Report, is found at ECF # 63-3.  EXHIBIT B in the affidavit, the letters sent by Plaintiff's mother, is found at ECF # 63-5.  EXHIBITS C, E and G in the affidavit, the letters sent by Plaintiff's lawyer, are found at ECF # 63-6.  (EXHIBITS D and F, letters sent by Plaintiff's lawyer to Dr. Koon, are not included in the record.)

far more plausible and what actually happened is that the letters were written, mailed and disregarded by Defendants – just like every plea of Plaintiff to obtain necessary, explicitly ordered treatment.

The Magistrate Judge erroneously discounted or disregarded the testimony of Dr. Herman because, "although Dr. Herman opines that the defendants were 'deliberately indifferent,' his testimony indicates that he equates deliberate indifference with negligence or failing to meet the standard of care." (ECF # 75, p. 20.) The Magistrate Judge erred because Dr. Herman simply indicated he did not have a lawyerly grasp of the meaning of deliberate indifference. The Magistrate Judge discounted or disregarded Dr. Herman's statements in his report, as well as compelling deposition and affidavit testimony, about the egregious nature of Dr. Valpey and other SCDC physicians' failure to examine or assess the condition of Plaintiff's arm and ankle injuries in any way during the entire year he struggled to recover while in prison. Dr. Herman testified that such conduct was deliberate indifference. (ECF # 63, Pl. Resp., pp. 21-26.)

In erroneously viewing the evidence in the light most favorable to Defendants, and in erroneously weighing the evidence and recommending that the Court grant summary judgment, the Magistrate Judge further discounted and disregarded Dr. Herman's testimony by incorrectly noting that Dr. Herman "does not treat surgical cases (akin to the plaintiff's)." (ECF # 75, p. 11 n. 6.) Actually, what Dr. Herman said was this:

> As I testified at my deposition, the post-surgery therapy for a radial head implant at our practice usually would be handled by therapists on the surgical team. However, I have seen and treated numerous patients with injury types that are nonsurgical that carry risk of heterotopic ossification. Defendants imply that by virtue of my training and employment in sports medicine my practice focuses on athletes, and hence do not treat conditions that would be associated with a risk of heterotopic ossification. This is not the case. My practice includes a wide range of patients with orthopedic complaints, who may or may not be athletes, in both my regular clinical settings and during my after-hours urgent orthopedic care clinics. These include acute traumatic injuries that are at risk for heterotopic ossification including forearm fractures, elbow fractures, hip fractures, and deep muscle contusions. Although not as large a component of my practice, I also have

seen and treated patients for musculoskeletal complaints who have high risk of heterotopic ossification by virtue of non-orthopedic issues (e.g. traumatic brain injury, spinal cord injury, stroke).

The Plaintiffs injury is this matter is entirely similar to the above conditions that I have treated when it comes to preventative measures and treatment for the condition of heterotopic ossification.  The need for appropriately aggressive and timely physical therapy is crucial in these cases in order to prevent the development of or limit the progression of heterotopic ossification. If appropriate treatment measures are not enacted and heterotopic ossification is allowed to progress unchecked, significant functional limitations and decreased quality of life can certainly result, regardless of whether or not a patient received surgical or nonsurgical treatment for their underlying condition.

(ECF # 63-28, Aff. of Herman, ¶¶ 4-5.)  Dr. Herman is board-certified in physical medicine and rehabilitation.  He is eminently qualified to testify in this case.  (See also ECF # 65, Pl. Resp. in Opp. to Defs.' Motion to Exclude Expert.)  The Magistrate Judge's view of Dr. Herman's qualifications and the import of his testimony are incorrect; if anything, such observations go to the weight of the expert's testimony at trial.

The Magistrate Judge's erroneous discounting and disregard of Dr. Herman's testimony is contrary to established law.  In Miltier, the Fourth Circuit reversed the district court's grant of summary judgment and ruling that the plaintiff's physician expert had failed to expressly state that the defendant physician's conduct constituted deliberate indifference.

We simply cannot agree that Rogers [v. Evans, 792 F.2d 1052 (11th Cir. 1986)] requires expert incantation of "gross indifference" or "deliberate indifference" before a Sec. 1983 claim against a physician can survive summary judgment.  We read Rogers merely to stand for the logical proposition that expert exploration is required to aid the jury in determining the threshold standard of medical care.  From there, it would require no great leap of logic for a jury to find, even without further expert testimony, that certain actions fell so far below the enunciated standard of care that they constituted gross indifference actionable under Sec. 1983. . . .

 In determining whether to grant summary judgment, all justifiable inferences must be drawn in favor of the non-movant. . . .  *Where it is an "eminently reasonable, if not inescapable, inference" that an expert would testify a certain way, denial of summary judgment is "entirely in keeping with the Supreme Court's admonition that 'all justifiable inferences are to be drawn in ... favor [of the non-movant].'"* . . . Taking the evidence of Gwendolyn's maltreatment in the light most favorable to Miltier, it is certainly an eminently reasonable, if not inescapable inference that Dr. Simpson would testify that, in

11

treating Gwendolyn, her physicians' actions "disregard[ed] a substantial risk of danger that either [was] known to [them] or would be apparent to a reasonable person in [their] position," . . . such as to render them liable under Sec. 1983.  Moreover, once a plaintiff "has named a witness to support her claim, summary judgment should not be granted without . . . somehow showing that the named witness' possible testimony raises no genuine issue of material fact." . . . At no time did Dr. Simpson limit his testimony to the negligence of the treating physicians and it was error for the trial court to infer such a limitation.

Miltier, 896 F.2d at 852 (citations omitted) (emphasis added).

Finally, the Magistrate Judge erred in viewing the evidence in the light most favorable to Defendants, and in weighing the evidence and recommending that the Court grant summary judgment, by discounting or disregarding Dr. Herman's testimony and opinions and instead endorsing the directly conflicting testimony and opinions of consulting Dr. Koon.  The testimony of these two physicians presents a factual dispute that is as head-on as two billy goats butting heads at a gallop.

The Magistrate Judge endorsed and cited with approval Dr. Koon's opinion that Plaintiff could have developed heterotopic bone formation in the elbow even if he had received therapy, and that therapy would not have helped improve his condition.  (ECF # 75, pp. 11-12.)

Dr. Koon testified that Plaintiff suffered severe injuries to the right elbow, including a destroyed radius bone and damaged ulnar nerve and ligaments in the elbow, and a badly broken ankle.  The radial head in the elbow was replaced with a metal implant.  On November 4, 2015, Dr. Koon ordered that Plaintiff receive "aggressive range of motion" with Plaintiff "to exercise daily on his own [and] "to be supervised by medical 3x week."  An SCDC nurse amended the order – with Dr. Koon's consent – to require physical therapy to be supervised by the SCDC medical staff three times a week instead of Plaintiff being seen by a licensed physical therapist. This order was entered into SCDC's electronic records and approved by Dr. Valpey.  (ECF # 63, Pl. Resp., p. 19.)

Dr. Koon testified that it was Dr. Valpey's job, as the SCDC-employed physician, "to make sure that the recommendations that the consultants give are carried out within SCDC means." Dr. Koon never wrote an order directing any supervised therapy visits to cease. At least 100 degrees of range of motion is needed to have somewhat normal function, but records show that Plaintiff in December 2017 had only 20 degrees in his right arm. Dr. Koon agreed with PT Ellis that, for a patient with injuries such as Plaintiff suffered, he would have ordered physical therapy by a licensed physical therapist at least twice a week for six to twelve weeks. Dr. Koon testified that Plaintiff never received any such course of therapy. (ECF # 63, Pl. Resp., pp. 19-20.)

The Magistrate Judge did not mention the following testimony by Dr. Koon, which sheds a revealing spotlight on the biases implicit in this doctor's opinion about the benefits of the denied therapy:

> Q. . . . Dr. Koon, do you believe that in your experience as an orthopedic surgeon that Andrew Glisson received sufficient physical therapy by a licensed physical therapist, which I believe it was three visits that he had from a licensed physical therapist there at the Department of Corrections, was that sufficient?
>
> [DR. KOON:] I would say that the majority of rehab in an injury like this is going to be self-directed. Now, is three visits enough, is 30 enough, is 100 enough, I'm not really sure. *So if it was my elbow I wouldn't need three visits, I would need one visit.*
>
> Q. Well, you're a highly-trained doctor, that's not exactly the same thing; is it?
>
> [DR. KOON]: I didn't mean it as a doctor. It's just – I mean, to be able do a self-directed therapy, you have to have discipline, you have to have pain tolerance, you have to do – you have to have compliance. And so if somebody tells me what to do, I'm going to do it whether I'm a doctor or not and that's just the way I am. Some patients you can have physical therapy for a year and a half for every day and they still get stiff elbows. So --
>
> Q. Right.
>
> [DR. KOON]: I think it -- his therapy was not according to, I assume, if it was not supervised, it wasn't according to what the doctor ordered.

13

(ECF # 63-21, pp. 45-46) (emphasis added).

> Q.  Right. Okay. When we talked with PT Cynthia Ellis a couple of weeks ago, she told us that if Andrew had been a regular patient, someone who is not in prison, that he would have received therapy by a licensed physical therapist or the physical therapy assistant for twice a week for six to 12 weeks, that would be the norm in her experience for this type of injury in the arm and elbow?

> [DR. KOON]:  I would agree with that.

> Q.  All right. And did Andrew Glisson get anywhere near that, he did not get twice a week physical therapy by a supervised -- by a licensed physical therapist for 12 weeks, did he, or six to   12 weeks?

> [DR. KOON]:  He did not.

> Q.  All right. Dr. Koon, would you agree with me that physical therapy – I understand you were telling us that and I respect that, that you may be a more determined and more – a more determined patient than some and able to follow the instructions better than some, but is it not true that there are plenty of people in the world who are not like that and that's why physical therapy is so important that you monitor them as far as what's going on, you encourage them, both, you know, physically and emotionally to make the patient improve, is that not one of the key purposes of physical therapy?

> [DR. KOON]:  When you say there are many people in the world, I go Haiti twice a year and so none of my patients in Haiti get physical therapy –

> Q. Right. Well, we're –

> [DR. KOON]:  -- three times a week for 12 weeks.  *So I think the United States is spoiled in their medical care and I think that getting physical therapy three times a week for 12 weeks is way overboard and probably not something that they really need. And my wife hates when I go to Haiti because I come back with less sympathy than I went before.*

> Q. Well –

> [DR. KOON]:  But, you know, this is a first world problem having, you know, folks who can do that for us. I – I would never expect a patient of mine in the SCDC system to have directed physical therapy three times a week.

> Q. Right. And that's not what was ordered here, we've been over that a couple of times –

> [DR. KOON]:  Right.

> Q. – what was ordered here by you is – and Dr. Money is to have supervised medical staff – supervised physical therapy by the medical staff, correct?

14

[DR. KOON]:  No, our recommendation was to have supervised physical therapy, which I assumed was going to be once a week by Cindy, for the initial several weeks.  And after that, it was going to be strictly on his own.

Q.  Right. But we looked at that though and it also talked about three times a week he was to come in and have that supervised by the medical staff.  And I understand you're telling me, oh, that's a – you know, we're spoiled in the first world, but regardless, that's the way our system works in America today; is it not?

[DR. KOON]:  I also represent that I didn't exactly know what sort of configuration that supervised therapy would have been. That could have been somebody knocking on his door saying, hey, are you doing your elbow exercises or that could have been somebody transporting him to a special clinic where they watched him do his exercises, I don't -- I can't represent that.

Q.  All right. Well, you're the one that wrote the note, you and Dr. Money wrote that note.  Did you write a note that you didn't understand what was going – the Department of Corrections wasn't going to do; I'm not following that.

[DR. KOON]:  Rephrase that for me.

Q.  Well, you wrote a note and Dr. Money wrote a note, which you approved, saying supervised physical therapy by the medical staff three times a week.  And yet you're telling me you don't really know what that means at this point?

[DR. KOON]:  And I've also said that when I say weight bearing is tolerated, right – lower extremity, right upper extremity with aggressive range of motion and supervised physical therapy.   My assumption would have been that he would have seen Cindy once a week until his follow-up appointment.

Q. Right.

[DR. KOON]:  [Nurse] Fran wrote: Can we talk about PT today, medical to supervise exercises three times a week. And that's what I'm representing that I don't know exactly how that would take shape.

Q. Okay.  And as we've seen from the records, he did not see the licensed physical therapist, Ms. Ellis, once a week either, he saw her three times; is that not correct?

[DR. KOON]:  That's what I've seen today, yes.

(ECF # 63-21, pp. 48-52) (emphasis added).

Dr. Koon's opinion on causation should be considered – by a jury – in light of his

gratuitous, ludicrous comments that he would only have to be shown an exercise once and then

he would have no need of any further help with therapy, and his ludicrous belief that spoiled, rich Americans (apparently including impoverished inmates like Plaintiff who are severely injured on an undesired prison work crew) expect too much medical treatment and ought to be happy with whatever crumbs, if any, the doctor deigns to brush off his jacket.

More importantly, Dr. Koon's testimony and opinion directly conflict with the testimony and opinion of Dr. Herman, Plaintiff's expert. Dr. Herman testified that if the necessary medical care and supervised therapy as ordered by the consulting physicians had been provided, it would have made a significant difference in the condition of Plaintiff's arm and ankle, likely resulting in far greater and a usable 100 degrees of range of motion in the right arm. With regard to the arm injury,

> [w]hile it is very unlikely that implementation of the desired rehabilitation plan would have resulted in an outcome that was absent any deficits, significant functionality could have been achieved. For example, an arc of 100 degrees of range of motion from -30 degrees of extension to 130 degrees of flexion is required for individuals to perform approximately 90% of their normal activities of daily living, and would have represented an achievable goal for Mr. Glisson. (ECF # 63, Pl. Resp., p. 25.)

There is nothing in Eighth Amendment jurisprudence which allows or requires the Court to accept one party's testimony and evidence over another under these circumstances. In fact the Court must accept the evidence in the light most favorable to Plaintiff and disputed issues of fact must be resolved by a jury. If the jury believes Plaintiff's evidence and witnesses, it will find that Defendants had the requisite subjective knowledge, were deliberately indifferent and their indifference caused great harm to Plaintiff. If the jury believes Defendants' evidence and witnesses, it will not.

But instead of recommending that summary judgment be denied so that the jury may consider the directly conflicting evidence between the two physicians, and resolve a genuine issue of material fact, the Magistrate Judge viewed the evidence in the light most favorable to

Defendants, discounted and disregarded Dr. Herman's testimony, accepted Dr. Koon's testimony, and recommended that summary judgment be granted because the denied medical care would not have made any difference in his condition anyway.

In all of these ways the Magistrate Judge viewed the evidence in Defendants' favor even though the law is clear that in § 1983 cases, like any other case, the court must view the evidence and inferences in the light most favorable to the plaintiff.  See Vathekan v. Prince George's County, 154 F.3d 173, 180 (4th Cir. 1998) (at the summary judgment stage, "disputed facts are treated no differently in . . . the qualified immunity analysis than in any other context," and therefore, "summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants") (internal quotation marks omitted).

The hurdle of proving deliberate indifference is admittedly high and a plaintiff must show more than mere negligence.  "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."  See Farmer, 511 U.S. at 836.  But it is not meant to be an impossible hurdle.  The bar is not supposed to be set so high that prison doctors and officials are effectively immune even when they repeatedly and recklessly disregard an inmate's objectively serious medical needs, never personally examine or assess an inmate's condition for an entire year, and repeatedly and recklessly disregard complaints from the inmate, the inmate's mother and his lawyer.

The Court should reject the Magistrate Judge's recommendation and allow this case to proceed to trial.

III.

The Magistrate Judge erred in recommending that the Court rule Plaintiff has failed to demonstrate that Defendants violated his constitutional rights, and also in recommending that Plaintiff's claims be dismissed as barred by the doctrine of qualified immunity.  (ECF # 75, p. 25.)

As explained in Plaintiff's Response, on the first question in the analysis of qualified immunity, viewing the facts in the light most favorable to him, Plaintiff has shown that a constitutional violation occurred.  As explained in detail above and in Plaintiff's Response in discussion of the objective and subjective prongs on deliberate indifference, Plaintiff has presented substantial, compelling evidence that Defendants acted with deliberate indifference in failing to provide him with appropriate and necessary medical care explicitly ordered by physicians, and in failing to timely and properly evaluate his condition and recovery.  Plaintiff has presented genuine issues of material fact which should be resolved by a jury.

Plaintiff has presented evidence demonstrating that Defendants' conduct was deliberately indifferent.  The evidence shows that Drs. Valpey, Moore and Ingraham did nothing more than check boxes and "sign off" on electronic medical records.  They did not fulfill their responsibility as doctors by actually *examining* the patient, actually *assessing* the patient's condition and course of treatment, actually *determining* what needs to be done to heal him and actually *ensuring* necessary medical care was provided.  They did not ensure that medical care and staff-supervised therapy explicitly recommended by Dr. Koon and ordered by SCDC physicians actually was provided to Defendant and actually was improving his condition.  They did not properly evaluate Plaintiff's ongoing condition and recovery.  That is deliberate indifference and a reckless disregard of Plaintiff's constitutional right to necessary medical care for a serious medical need.

As explained above, with regard to Defendants Riley, McKie and Mitchell, they were

deliberately indifferent in failing to respond to Plaintiff's pleas for help and ensure that the medical treatment and therapy actually were provided by the SCDC physicians. The subjective prong is met because Plaintiff repeatedly requested help and complained about his pain, lack of progress and limitations to nurses and in written Requests to Staff. Plaintiff's mother, a retired nurse, wrote three letters to the warden, explicitly requesting that proper therapy for the severe injuries be provided. Plaintiff's lawyer wrote three letters to SCDC's lawyer, explicitly requesting that proper therapy for the severe injuries be provided. The pleas were ignored across the board.

Defendants wish to simply say, "I never saw it; I never heard of it; I didn't know it" or "he should have filed a grievance." Defendants expect the Court to dismiss the case based on their denials. But such denials are unavailing and unpersuasive in light of the compelling evidence presented by Plaintiff. In any event, a jury trial is necessary to determine numerous disputed issues of material fact.

On the second question, Defendants obviously cannot meet their burden of showing that the constitutional right at issue is not clearly established. The general Eighth Amendment right at issue is the longstanding principle that a prisoner may not be subjected to deliberate indifference of a serious medical need. This right was clearly established at the time of the violation. E.g. Smith v. Smith, 589 F.3d 736, 739-40 (4th Cir. 2009) (applying this principle and reversing district court's dismissal of case and remanding for further proceedings where Plaintiff alleged deprivation of medical care). Plaintiff alleges a deprivation of this fundamental, well-established right which dates back at least to 1976 in the Supreme Court's decision in Estelle v. Gamble, 429 U.S. 97 (1976).

The Court should reject the Magistrate Judge's recommendation and allow this case to proceed to trial.

## CONCLUSION

Plaintiff, an experienced construction worker and carpenter, planned to return to work as a productive member of society after paying for his crime. As a result of Defendants' deliberate indifference and failure to provide crucial medical treatment, he now is totally disabled, has a crippled right arm that will never swing a hammer again, and lives in poverty in a rundown camper parked in his mother's front yard.

Plaintiff has presented substantial, compelling evidence that Defendants acted with deliberate indifference, all in violation of his rights under the Eighth Amendment, in failing to provide him with appropriate and necessary medical care for a serious medical need. Plaintiff has presented a genuine dispute of material facts and is entitled to present his case to a jury.

The Magistrate Judge erroneously embraced Defendants' call to focus on unrelated medical care that was provided to Plaintiff instead of focusing on the constitutionally denied care, the denial of which has left Plaintiff forever crippled, disabled and unable to support himself. The Magistrate Judge, despite assertions to the contrary, erroneously viewed the evidence in the light most favorable to Defendants. The Magistrate Judge recognized and discussed the existence of genuine issues of material fact, but erroneously proceeded to weigh the evidence and recommend that the Court grant summary judgment instead of allowing the case to proceed to a jury.

For all the foregoing reasons, Plaintiff asks the Court to reject the Magistrate Judge's recommendation and deny Defendants' motion for summary judgment, deny Defendants' motion that they are entitled to judgment based on qualified immunity, deny Defendants' motion to exclude Plaintiff's expert other arguments as described herein and in Plaintiff's Response, and allow this matter to proceed to trial.

Respectfully submitted,

*s/ David Proffitt*
David Proffitt
Federal ID No. 7503
Proffitt & Cox, LLP
140 Wildewood Park Drive, Suite A
Columbia, SC  29223
(803) 834-7097
FAX:  1-888-711-1057
dproffitt@proffittcox.com

Attorneys for Plaintiff

January 24, 2020